[Cite as *In re L.M.*, 2019-Ohio-5402.]

STATE OF OHIO            )          IN THE COURT OF APPEALS
                         )ss:       NINTH JUDICIAL DISTRICT
COUNTY OF WAYNE          )

IN RE: L.M.                          C.A. Nos.    18AP0055
      E.M.                                        19AP0014


                                     APPEAL FROM JUDGMENT
                                     ENTERED IN THE
                                     COURT OF COMMON PLEAS
                                     COUNTY OF WAYNE, OHIO
                                     CASE Nos.    2015 JUV-G 000638
                                                  2015 JUV-G 000639

DECISION AND JOURNAL ENTRY

Dated: December 31, 2019

---

CARR, Judge.

{¶1}   Appellant Sean M. ("Father") appeals from the judgment of the Wayne County Court of Common Pleas, Juvenile Division.  This Court affirms.

I.

{¶2}   Father and Appellee Samantha Y. ("Mother") never married.  During their relationship, Mother gave birth to two children, L.M. (born February 26, 2013), and E.M. (born March 3, 2015).  Mother and Father ended their relationship in late 2015.  Custody proceedings were initially filed in Lorain County in late 2015.  The record reflects that the parties entered into an agreed shared parenting plan in July 2016, which was filed in the court.  Mother was named the residential parent for school purposes.  Father was to receive parenting time every weekend of every month, aside from the fourth weekend.  In addition, Father was to receive four weeks of parenting time in the summer.  Apart from holidays, which were separately designated, the

children would be with Mother at all other times. Father was ordered to pay $400.00 per month in child support.

{¶3} Subsequent to the adoption of the shared parenting plan, both parties married. Mother married Joshua Y. ("Stepfather") in September 2016 and Father married Teresa M. ("Stepmother") in September 2017. Following their marriages, Mother moved to Creston in Wayne County, and Father moved to Willowick in Lake County. Stepmother's two children also live with Father at the house in Willowick.

{¶4} In August 2017, following a request by Mother, the case was transferred to Wayne County. On August 17, 2017, Father filed a motion to "Change Custody – Making Father the Custodial Parent[.]" Therein, Father requested an order "changing custody to make the Father the custodial parent of the child." Inter alia, Father alleged that Mother failed to keep the children up-to-date on their vaccinations, had not taken the children to a dentist, refused to list Father as the children's father at the children's doctor's office, and had denied him visitation. That same day, Father also filed a motion concerning the alleged denial of parenting time. In September 2017, Mother filed a motion to terminate the shared parenting plan and designate Mother as the residential parent of the children.

{¶5} A guardian ad litem ("GAL") was appointed. After conducting home visits and reviewing various records, the GAL prepared a report concluding that it was in the children's best interest for Father to be made the custodial parent.

{¶6} The matter proceeded to a hearing. After which, on October 15, 2018, the magistrate issued a magistrate's decision denying Father's motion, granting Mother's motion, and awarding custody to Mother. On October 24, 2018, the trial court entered a judgment entry reiterating the decision of the magistrate. On October 29, 2018, Father filed objections to the

magistrate's decision. Father argued that the magistrate abused its discretion in denying Father's motion to modify the shared parenting agreement as the trial court failed to follow R.C. 3109.04(E)(1)(a), that the magistrate failed to follow R.C. 3109.04(E)(2)(c) in terminating the shared parenting plan, and that the magistrate's decision to deny Father's motion and to terminate the shared parenting plan was against the weight of the evidence.

{¶7} Prior to the trial court ruling on the objections, Father filed a notice of appeal to this Court (appeal number 18AP0055). Therein, Mother filed a motion to dismiss and Father filed a motion to remand the matter to the trial court so that the trial court could rule on objections. This Court granted the motion to remand the matter.

{¶8} After the transcript was filed in the trial court, Father filed supplemental objections to the magistrate's decision. Mother then filed a memorandum in opposition to Father's objections and supplemental objections. On February 1, 2019, the trial court issued an entry overruling Father's objections. In so doing, the trial court determined that both parents' motions required the trial court to apply R.C. 3109.04(E)(1) and determine whether there was a change of circumstances. The trial court found that there had been a change of circumstances and that it was in the best interest of the children that Mother be granted sole legal custody. The trial court stated it was bound to consider the factors in R.C. 3109.04(F)(1) and 3109.04(F)(2) and then summarized its analysis of the factors.

{¶9} Father filed a notice of appeal from that entry (appeal number 19AP0014) and the two cases were consolidated. Father has raised two assignments of error for our review. To facilitate our analysis, we will address Father's assignments of error out of sequence.

II.

**ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FAILED TO FOLLOW R.C. 3109.04(E)(2)(C) AND GRANTED MOTHER'S MOTION TO TERMINATE THE PARTIES['] SHARED PARENTING AGREEMENT WITHOUT DETERMINING WHETHER SUCH TERMINATION IS IN THE BEST INTERESTS OF THE CHILDREN; AND DESIGNATING MOTHER THE RESIDENTIAL PARENT; AND WHICH IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶10} Father argues in his second assignment of error that the trial court failed to comply with R.C. 3109.04(E)(2) in terminating the shared parenting plan and that its decision to name Mother the residential parent and legal custodian of the children was against the manifest weight of the evidence.

{¶11} "[W]e generally review a trial court's action on a magistrate's decision for an abuse of discretion, but do so with reference to the nature of the underlying matter." (Internal quotations and citations omitted.) *Brosky v. Krebs*, 9th Dist. Lorain No. 17CA011161, 2018-Ohio-5261, ¶ 6. "This Court reviews the trial court's termination of a shared parenting plan for an abuse of discretion." (Internal quotations and citation omitted.) *Sindelar v. Gall*, 9th Dist. Summit No. 25022, 2010-Ohio-1960, ¶ 8. Further, "[a] trial court possesses broad discretion with respect to its determination of the allocation of parental rights and responsibilities, and its decision will not be overturned absent an abuse of discretion." *Stahl v. Stahl,* 9th Dist. Summit No. 27876, 2017-Ohio-4170, ¶ 4. Thus, the trial court's determination will not be disturbed unless the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Even so, when this Court must determine whether the trial court has correctly applied the law in a given case, we review such questions of law de novo." *In re B.I.W.*, 9th Dist. Wayne No. 18AP0028, 2018-Ohio-4545, ¶ 11.

**Termination of the Shared Parenting Plan**

{¶12} The heart of Father's argument is that the trial court failed to conduct the best-interest analysis outlined in R.C. 3109.04(E)(2) in terminating the shared parenting plan and naming Mother the residential parent. However, the trial court did conduct a best-interest analysis in its judgment entry overruling Father's objections. It is apparent from considering the whole of that entry that the trial court found: (1) that a change of circumstances had occurred; (2) that terminating the shared parenting plan was in the best interest of the children; and (3) that it served the best interest of the children to name Mother the sole residential parent. While the trial court did not expressly state that terminating the shared parenting plan was in the best interest of the children, the trial court did specifically acknowledge that termination of the shared parenting plan involved a consideration of the best interest of the children.[1] It then concluded its analysis with a finding that "the Court concurs with the Magistrate's determination that it is in the children's best interest to be placed in the sole legal custody of Mother."

{¶13} Further, even though the trial court did apply R.C. 3109.04(E)(1)(a), which involves *additional* considerations along with a best-interest analysis, *see* R.C. 3109.04(E)(1)(a), as opposed to R.C. 3109.04(E)(2), Father has not explained how doing so resulted in reversible error when the trial court did undertake a best-interest analysis, and it is not this Court's duty to develop an argument for him. *See* App.R. 16(A)(7); *Stowe v. Chuck's Automotive Repair, LLC*, 9th Dist. Summit No. 29017, 2019-Ohio-1158, ¶ 27 ("It is not the function of this [C]ourt to construct a foundation for [an appellant's] claims[.]") (Internal quotations and citation omitted.).

---

[1] In considering Father's objections, the trial court stated, "In other words, Father argues that the Magistrate should have granted Father's Motion to Change Custody and denied – at least in part – Mother's Motion to Terminate the Shared Parenting Plan. This contention is based on a dispute regarding the children's best interest."

{¶14} Despite Father's argument to the contrary, the record is clear that the trial court considered the best-interest factors. The trial court, in its entry overruling objections to the magistrate's decision, indicated that it was bound to consider the best interest factors in R.C. 3109.04(F)(2) and 3109.04(F)(1). The trial court then expressly and individually analyzed a number of best-interest factors.

{¶15} Father has not met his burden to demonstrate that the trial court committed reversible error in applying R.C. 3109.04(E)(1)(a) as opposed to R.C. 3109.04(E)(2).

### Best Interest of the Children

{¶16} Father additionally argues that it was not in the children's best interest for Mother to be named the sole residential parent and for the trial court to terminate the shared parenting plan. Father asserts that such a determination was against the manifest weight of the evidence.

{¶17} "In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered.'" *In re T.K.*, 9th Dist. Summit No. 28720, 2017-Ohio-9135, ¶ 7, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001). "When weighing the evidence, this Court 'must always be mindful of the presumption in favor of the finder of fact.'" *In re T.K.* at ¶ 7, quoting *Eastley* at ¶ 21.

{¶18} R.C. 3109.04(F)(1) provides:

In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶19} R.C. 3109.04(F)(2) states:

In determining whether shared parenting is in the best interest of the children, the court shall consider all relevant factors, including, but not limited to, the factors enumerated in division (F)(1) of this section, the factors enumerated in section 3119.23 of the Revised Code, and all of the following factors:

(a) The ability of the parents to cooperate and make decisions jointly, with respect to the children;

(b) The ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent;

(c) Any history of, or potential for, child abuse, spouse abuse, other domestic violence, or parental kidnapping by either parent;

(d) The geographic proximity of the parents to each other, as the proximity relates to the practical considerations of shared parenting;

(e) The recommendation of the guardian ad litem of the child, if the child has a guardian ad litem.

{¶20} On appeal, Father asserts that the trial court's decision was against the weight of the evidence because Mother was not providing proper medical care for the children, there were safety concerns in Mother's home, and L.M. had numerous absences from preschool. Father points out that the GAL recommended that Father be named the custodial parent and that the GAL believed Father's concerns were warranted. Mother in turn asserts that the weight given to the GAL's report was appropriate under the circumstances. Mother admits that there was an approximately two-year period during which she failed to keep the children up-to-date on their vaccinations but contends the problem was remedied and maintains that she has never failed to take the children for medical treatment when they were ill. Mother notes that the record contains troubling evidence about Father's aggressive and sometimes violent behavior, which sometimes occurred in front of the children.

{¶21} At the time of the hearings, in April 2018 and September 2018, L.M. was five years old and E.M. was three years old. There is no dispute that both children are bonded with their parents and have good relationships with their stepfamilies. Both children were described

in positive terms by those who knew them. The children primarily reside with Mother and Stepfather in a home in Creston. In September 2018, Mother gave birth to another child, which is her first child with Stepfather. When the children visit Father, they stay in the home Stepmother and Father share in Willowick. Stepmother has two children of her own who also reside with Stepmother. L.M. and E.M. stay in a finished room in the basement when they stay with Father and his family. It is unclear from the record whether the windows in the basement comply with residential codes with respect to means of safe egress in the event of an emergency. The GAL did not express concerns about the condition of either parent's home.

{¶22} It did, however, concern the GAL that, upon his initial home visit to Mother's house, the children were very disruptive and rambunctious. Mother believed that this was due to the children not knowing the GAL and just wanting to get his attention. Mother also noted that the GAL did not interact with the children or really talk to them much at all. When the GAL discovered that the children were much better behaved at Father's house, the GAL opted to make a second visit to Mother's house. At the second visit, the GAL noted that the children's behavior was much improved. However, the GAL felt that the children would benefit from more supervision and structure and believed that Father would provide that.

{¶23} During his investigation, the GAL discovered an incident in 2017 in which the police were called to Mother's home for a welfare check. A neighbor reported that he saw two children on the roof of the house. When police went to the house, only Stepfather was home. Stepfather testified that, at the time, Mother was not home and the children had been playing and went upstairs to get a toy. When the children were gone longer than expected, Stepfather went up to check on them. Before reaching the room, Stepfather heard a voice, looked out the window, and noticed the children talking to a person outside. When Stepfather reached the room

the children were in, the window was only open about six inches and the children were inside. Stepfather and Mother did not believe the children were ever on the roof, and instead believed that while the neighbor thought the girls were on the roof, it only appeared that way based upon the way the window was situated and the angle of the roof. No charges were filed based upon the incident. Following the incident, Stepfather placed a board above the window to prevent the children from opening the window. Stepfather testified that the children had never done anything like that before and had not done it again since. The GAL was especially concerned by this incident as he discovered it on his own and was not alerted to it by Mother. The neighbor was never called to testify at the hearing.

{¶24} The testimony disclosed that Father and Mother terminated their relationship in late 2015. From this time until mid-2017, Mother acknowledged that the children were not receiving vaccinations. Mother married Stepfather in September 2016, moved to Wayne County and no longer had an established pediatrician for the children. Mother maintained that the new doctor did not send reminder notifications about vaccinations as the old doctor had done and the doctor did not bring up the issue when Mother brought the children in when they were ill. Mother admitted at the hearing that it was a "big mistake" on her part to allow the children to fall behind in their immunizations. Notwithstanding the foregoing, by the time the children entered school, L.M. in 2017, and E.M. in 2018, the children were caught up on their vaccinations.[2] Mother testified that she continued to take the children to the doctor if they were sick and would

---

[2] The testimony concerning which parent took the children for vaccination appointments in 2017 and 2018 is somewhat confusing. Mother testified that she took L.M. in the summer 2017 to catch her up on her vaccinations and have a physical. Mother also testified that, even though Mother scheduled E.M. for vaccinations prior to preschool, Father took E.M. in for vaccinations in April 2018. However, on cross-examination, Mother seemed to indicate that it was Father who took both children to the doctor to bring the children's vaccinations up-to-date.

give the children any medicine they were prescribed. On appeal Father disputes that Mother took the children to the doctor, asserting that his exhibit demonstrates that Mother did not submit claims to his insurance for the period from September 2016 to April 2018, and thus Mother did not take the children to the doctor. However, Mother supplied doctor visit summaries that fall within the above period of time demonstrating that she did in fact take the children to the doctor. In addition, prior to entering school, Mother took L.M. and E.M. for a dental appointment, as required by the school. Mother also took both children for a physical in July 2018.

{¶25} Father also asserted that Mother failed to timely address L.M.'s vision problems. L.M.'s preschool teacher testified that the children receive a vision screening in November and that that screening is often the children's first vision test. A note was sent home with L.M. indicating that the school nurse had conducted a vision test and L.M. did not pass the test. Prior to that time, neither parent, nor the preschool teacher noticed that L.M. had any vision problems. When Mother received the notice, she made an appointment and L.M. had glasses in December. While Father asserted that he could have gotten L.M. into the eye doctor sooner, he did not demonstrate that Mother completely failed to address L.M.'s vision concerns or that L.M.'s vision issue was an emergency situation.

{¶26} Father also expressed concern about the children's hygiene, asserting that they sometimes smelled, that E.M. had dirty underwear, and the children had clothes that did not fit well. While Mother acknowledged that E.M. did wear hand-me-down clothes, including sometimes underwear, Mother testified that the children were bathed at least every other day, and sometimes every day. Mother maintained that she did not dress the children in dirty clothes. The preschool teacher testified that she never noticed any hygiene issues with L.M. and that L.M. was always dressed appropriately.

{¶27} As to Father's and the GAL's concern that L.M.'s ten absences from August 2017 through March 2018 were excessive, the preschool teacher did not seem to find them troubling. The preschool teacher noted that preschool is not mandatory in Ohio and that L.M. was doing well academically and was prepared for kindergarten. L.M. did enter kindergarten in fall 2018. As of the September 2018 hearing, both children were said to be well-adjusted to school.

{¶28} The record also disclosed some troubling evidence about Father. Mother, Stepfather, and Mother's mother all testified that Father was often confrontational when the children were being exchanged. Several incidents were described. During one incident, Father slapped a cell phone out of either Mother's or Stepfather's hand as Father was berating them. There was also testimony that Father tried to shove his foot into the door of Mother's and Stepfather's home and tried to shove the door back at Stepfather as Stepfather was trying to shut it. Mother's mother testified that Father would disparage Mother and call her stupid and Mother testified that Stepmother told L.M. that Mother did not care about L.M. Because the exchanges became so confrontational, they were ultimately moved to the police station near Mother. However, Father continued to be confrontational.

{¶29} There was also testimony presented that a few domestic incidents between Father and Stepmother were reported to the police. Following one of those incidents in October 2017, Stepmother sought treatment from a forensic nurse. Stepmother reported to the nurse that she sustained injuries during a domestic violence incident. The nurse then made a police report. Father agreed that Stepmother went to the hospital because she thought she broke her hand but denied it was connected to domestic violence. While the GAL was aware of the incidents, they did not sway the GAL in his recommendation. The GAL noted that when he talked to Stepmother and Father about the incidents they "down played" them. While the GAL agreed the

reports were concerning, he noted that no charges were filed and no protection orders were sought.

**{¶30}** In addition, Father's brother's girlfriend testified about an incident in April 2017 at Father's sister's birthday party. Father became enraged, pushed his sister and his mother. This upset Father's brother's girlfriend, leading her to hit Father. Then a physical fight ensued. Father's brother's girlfriend did not know L.M. and E.M. were in the room until L.M. screamed. Father's brother's girlfriend then left the room and went outside. She told Father's brother what happened and then Father and Father's brother got into an argument. Father's brother tried to leave and Father followed him and threatened to go get his shotgun and shoot Father's brother. Father instead retrieved a bat from his truck and swung at Father's brother several times until someone took it away from him. Finally, Father's brother's girlfriend convinced Father's brother to leave.

**{¶31}** While the trial court noted that certain factors did favor Father, including the GAL's recommendation and the fact that Mother failed to keep the children up-to-date with their routine immunizations for almost two years, the trial court expressed concern about Father's confrontations with Mother, Stepfather, and Stepmother, and about where the children stay when they are with Father. The trial court also made the findings and decision of the magistrate the order of the trial court. Overall, the trial court concluded that the weight of the evidence supported that it was in the best interest of the children to be placed in the sole custody of Mother.

**{¶32}** After a thorough and independent review of the record, we cannot say that the trial court abused its discretion in concluding that it was in the best interest of the children to terminate the shared parenting plan and grant Mother sole custody of the children. The evidence

of Father's aggressive and confrontational behavior, which also occurred in the presence of the children, was understandably troubling to the trial court. Even assuming that Father had a right to be angry or upset at Mother's behavior, it is not appropriate for the children to be exposed to repeated confrontations. And while certainly it was not acceptable for Mother to fail to take the children for vaccinations for two years, Father's allegation that Mother failed entirely to take the children to the doctor was unsupported. Father's allegations concerning the children's hygiene, whether L.M.'s vision issue was addressed in a timely matter, and the import of L.M.'s school absences were contradicted through other testimony. Moreover, the magistrate found that, from the evidence presented, there was no proof the children were on the roof while in Stepfather's care. The magistrate noted that no police testimony was presented nor were any photos of the house offered into evidence. Thus, many of the GAL's concerns, which led to his recommendation, were found to be unsupported.

{¶33} Father has not demonstrated that the trial court abused its discretion in concluding that it was in the best interest of the children to terminate the shared parenting plan and grant Mother sole custody of the children.

{¶34} Father's second assignment of error is overruled.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING FATHER'S MOTION TO MODIFY CUSTODY UNDER A SHARED PARENTING PLAN AS THE TRIAL COURT HAS FAILED TO FOLLOW R.C. 3109.04(E)(1)(A) WHICH REQUIRES THAT THE TRIAL COURT DETERMINE WHETHER THERE HAS BEEN 1.) A CHANGE IN CIRCUMSTANCES; 2.) MODIFICATION WAS NECESSARY TO SERVE THE CHILDREN'S BEST INTERESTS; AND 3.) THE HARM LIKELY CAUSED BY THE CHANGE WAS OUTWEIGHED BY THE ADVANTAGES OF THE CHANGE TO THE CHILDREN; SUCH DETERMINATION IS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶35} Father argues in his first assignment of error that the trial court failed to apply R.C. 3109.04(E)(1)(a) in addressing his motion and that the trial court's decision to deny his motion was against the weight of the evidence.

{¶36} Regardless of whether R.C. 3109.04(E)(1)(a) was applicable to Father's motion, the trial court determined that it was appropriate to terminate the shared parenting plan and that it was in the children's best interest for Mother to be the sole custodial parent; as discussed above, we concluded that decision was not against the manifest weight of the evidence. Accordingly, it could not also be in the children's best interest for Father to be the custodial parent. Thus, Father has not demonstrated the trial court committed reversible error in denying his motion.

{¶37} Father's first assignment of error is overruled.

III.

{¶38} Father's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

EDWIN V. HARGATE, Attorney at Law, for Appellant.

RACHEL HOFFEE, Attorney at Law, for Appellee.

LEE R. POTTS, Guardian ad Litem.